FILED

2006 Feb-08  PM 03:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| OWNERS INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:04-cv-00286-JEO |
| | ) | |
| MARVIN DEWAYNE BATES and | ) | |
| STACY DIANE BATES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is before the court on the motion of plaintiff/counter-defendant Owners Insurance Company (hereinafter "Owners" or "the plaintiff") for partial summary judgment. (Doc. 21). The plaintiff filed a complaint for declaratory judgment with this court on February 12, 2004, in which it asked this court to (1) declare an insurance contract between the parties to be null and void; (2) declare that Owners has no duty or obligation to Marvin Bates and/or Stacy Bates; and (3) declare that there is no coverage under the Owners policy for the claim the Bates submitted. (Doc. 1). Defendant Marvin Bates, (hereinafter "the counter-plaintiff" or "Bates") filed his answer to Owners' claims along with counterclaims for breach of contract and bad faith on August 30, 2004. (Doc. 12). Owners now seeks a summary judgment on the bad faith claim. For the reasons set out herein, the court finds that the motion is due to be granted.

## FACTS

On April 17, 2003, Bates' residence burned. The local volunteer fire department responded to and extinguished the fire. On April 21, 2003, Bates reported the claim to the

defendant insurance company.  That same day, Owners hired a fire investigator, Robert Young,[1]

to conduct a cause and origin investigation, which is standard policy and procedure when no

accountable reason for a fire exists and the claim exceeds $100,000.00.  (Bostick Dep. at pp. 80,

147, & 165).[2]  At the time Owners hired Young, it had no evidence that the fire was of suspicious

origin.  (*Id*. at p. 165).  Because the Owners' adjusters' workloads were too busy to conduct a full

scale investigation, Owners hired an independent adjuster to manage the claim and Young to

investigate the claim.  (*Id*. at p. 168).

On April 23 and 24, 2003, Young conducted a cause and origin investigation and

determined the cause of the fire to be incendiary in nature.  (Young Report).[3]  Young's report of

his investigation is six pages long and covers various topics including the risk involved, his scene

examination, information on how the fire was discovered, evidence that was removed from the

scene for forensic analysis, and his conclusion discussing the origin and cause of the fire.  (Ex.

5).[4]  Young's account of the origin and cause is as follows:

> The house sat in a wooded area with a rough dirt road/driveway cluttered with
> scrap building materials and toys.  The yard was dirt and weeds which had
> nothing done for as landscaping [sic].  There was heavy smoke staining visible at
> eave overhangs with the most over left garage door.  The windows of first and
> second floor bedrooms were broken with broken glass on ground at front
> approximately 30 feet from house.  The fire had vented out rear first floor

---

[1] A copy of Young's curriculum vitae was provided to the court in support of Owners' motion for summary judgment. (Doc. 25 at Ex. 2).  Young's curriculum vitae consists of seven pages of fire-related experience.  Young has been an instructor of fire and arson investigation since 1976, was the Fire Prevention Inspector, Rank of Senior Fire Inspection Fire/Arson Investigator of the Birmingham Fire and Rescue Service from December 1959 to December 1988, and has been certified as a Fire Investigator by the International Association of Arson Investigators since 1988.  The Bates have not offered anything to contradict Young's credentials or experience.

[2] Michael Bostick's deposition is located at document 24, exhibit C in the court's record of the case.  Bostick was the FED. R. CIV. P. 30(b)(6) corporate representative for Owners at deposition.

[3] Young's report is located at document 21, exhibit 5.

[4] The exhibits referenced herein by numbers are located with the plaintiff's motion at document 21.

2

bedroom window and was so intense it consumed eave overhang causing extensive roof damage.

William Peak and Michael Kelly came by scene; they live close by and are friends of the Bates children; they stated garage door was open and fire was at stairs (Mr. Bates stated he closed left garage door by using switch inside basement).  Mr. Bates stated that there was sheet rock wall on garage door side of stairs but only metal studs on other side.  He stated there were no lights in stairs and the long extension cord found along front wall, under insulation batts to first step above landing was for a fluorescent light he used to light the stairs.  The cord (female end) had melted during fire on steps and adhered to step but there were no indications that light was connected.  The light remains were found in debris on left side of stairs.

The fire damage to insulation batts, floor joist consumed overhead next to foundation was a separate fire and no way connected to fire that occurred on steps. The steps on side of insulation was [sic] unburned but there was floor level burning on left sided [sic].  There was a piece of carpet on floor that had burned, the step riser, step and landing had deep charring but there was no falldown to have caused this damage and there was no sources [sic] of ignition that could have caused the burning.  The burning/charring continued up steps to top where there were holes burned through floor, floor joist had burn patterns that could only have been caused by burning ignitable liquid that ran through cracks of wood floor. The burning was examined on basement side and the burning did not come from below.  There were two containers of gasoline under stairs, according to Mr. Bates, in red and blue plastic containers.  The container remains were found in debris but the burning of wood braces and damage to metal studs was minor to none at floor.  The condition found indicated the plastic containers melted, gasoline vapors ignited as burning debris fell from above which was very little since walls enclosing stairs on first floor was [sic] sheet rock.

The motorcycles were examined and eliminated as fire cause.  The large motor was the one Blake was riding; it was found on floor next to steel floor support and was damaged as fire/heat spread from burning stairs.  The other motor was found on floor garage door side and it too was damaged as fire spread.  The motor found in yard had fire damage but it is unknown it's location in the basement.  The motors were manual start (kick lever) not electric which makes them non-electric unless motors [sic] running.

The electrical wiring for stairs was examined for arcing or shorting but none was found.  The electrical cord for fluorescent light at stairs was also examined; electrical was eliminated as fire cause.  The hall and bedrooms were closely examined for any possible source of ignition but nothing was found.  The path of

fire travel is up, the lowest level of burning was carpet on basement floor at steps, the burning progressed up to landing then up stairs to hall and to bedrooms leaving deep charring of wood. There was a second fire that occurred in insulation batts approximately eight feet from stairs but in no way connected to stair fire. The fiberglass will not burn, it will melt but the tar/paper backing is very combustible.

The sample of debris tested by forensic lab were negative for ignitable liquid residues but several factors that occur during a fire can result in negative findings. Someone poured an ignitable liquid in bedrooms, in hall down stairs and ignited two separate fires. No accidental cause or causes were found that could have caused this fire. The fire cause is classified as incendiary.

(Young Report at pp. 5-6).

After receiving Young's report, Owners advised the Bates that their claim would be investigated under a full reservation of rights to deny the claim should its investigation reveal a breach of the policy or a violation of Alabama law. (Ex. 6).[5] On November 3, 2003, the Bates

---

[5]Exhibit 6 is a letter from Mike Bostick of Owners Insurance to the Bates dated August 18, 2003. In this letter, Bostick wrote:

On April 28, 2003, I wrote to you and supplied blank Sworn Statement in Proof of Loss forms you were asked to complete and return within 60 days from the date of loss or by July 1, 2003. You were also asked to submit an inventory of the personal property that you were making claim for. Although you have not complied with these policy conditions within the time stated in the policy, Owners is voluntarily extending this time for an additional thirty (30) days from the date of this letter with additional forms enclosed for your convenience in complying with you [sic] policy obligations. Alabama law has interpreted these policy provisions to be conditions precedent before any duty arises under the policy for Owners to investigate the claim or to make any payment.

Please be aware that if you fail to meet any of your duties after a loss as stated in the policy, such as submission of the Sworn Statement in Proof of Loss, your failure to do so could cause you to lose insurance benefits you may otherwise be entitled to receive.

Owners Insurance Company is currently investigating coverage questions that have arisen in the claim. As you are aware, the fire was determined to be incendiary, or in other words, was not accidentally caused and it is possible that misrepresentations or concealment of material facts were made to us either before or after the loss. Without your cooperation and compliance with your policy duties after a loss, the investigation cannot be completed and Owners will not have sufficient information to make a decision as to whether the policy provides coverage for your claim.

The language from your policy titled "What To Do In Case Of A Loss" outlines your duties after a loss. After you have submitted the Sworn Statement in Proof of Loss and the supporting documents, Owners has elected to demand your appearance for oral examination under oath. You will note that providing an examination under oath is also a policy requirement. . . .

By calling your attention in this letter to specific provisions of the policy, Owners does not intend

separately provided sworn testimony about their claim.  Each of the defendants also submitted a

Sworn Statement in Proof of Loss to Owners dated November 3, 2003, making a claim for

damages to the structure of $180,000.00 and a claim for its contents of $28,064.00 from the fire.

(Ex. B).[6]

The day before the fire, an attorney for Mrs. Bates filed a Complaint for Divorce in the

Circuit Court of St. Clair County stating that she and Mr. Bates had been living separately since

January 30, 2003.  (Complaint Ex. D).  Along with the Complaint for Divorce, Mrs. Bates filed

an Agreement signed by both she and Mr. Bates on April 11, 2003, regarding the division of their

marital property.  (*Id*.).  The plaintiff was unaware of this information during the time the

investigation was being conducted.  The plaintiff appears to have been proceeding under the

impression that they were living together in the insured residence at the time of the fire.

After this action was filed, various volunteer firemen that were present at the scene of the

fire were interviewed and/or provided affidavits.  One of the volunteer firemen, Jason Baswell,

stated in his interview that although he had been a fireman with the Mountain Brook Fire

Department, as well as a volunteer with the Straight Mountain Volunteer Fire Department, he

only had minimal training investigating fires.  (Baswell Statement at p. 2).[7]  He further stated that

---

to lessen the importance of, nor waive any of the other provisions of the policy.  Owners fully and completely reserves the right to deny coverage for your claim if the investigation reveals a breach of the policy or violation of Alabama law has occurred.  You should read the entire policy to assure your compliance with all of its provisions.  If your policy has been lost or mislaid, another will be provided for you upon request.

However, if you do not wish to continue to pursue your claim by submitting the Sworn Statement in Proof of Loss or appearing for examination under oath, you may sign the enclosed Waiver of Claim form and upon receipt, the investigation will be halted and the claim file closed.  I am not suggesting that you should waive your claim, but because so much time has elapsed and you have failed to present your claim, I am merely offering that option if the delay is because you do not want to continue the claim investigation.

[6]The lettered exhibits are located with the defendant/counter-plaintiff's response at document 24.

[7]Transcripts of the interviews are located with defendant Bates' consolidated objection at exhibit E.

"the main training is in extinguishment of the fire." (*Id.*).  When asked if he saw any evidence of ignitable liquids in the house, Baswell responded, "Not that I recall . . . to tell you the honest truth I really didn't look that close, just busy with the task at hand." (*Id.* at p. 6).  The extent of his "investigation" consisted of asking the owner if they had left anything plugged in or running. (*Id.*).  He did not walk through the house to try to determine where and how the fire started. (*Id.*).  In fact, he did not even enter the basement, where he had been told the fire started.  (*Id.* at p. 5).  Instead, the closest he went was "standing in the [garage] doors looking in the basement but you know you couldn't see anything." (*Id.*).  In his affidavit, provided to counsel, he also stated that no one from Owners contacted or interviewed him.  (Baswell Affidavit at ¶ 2).[8]

Volunteer fireman Robert Southern stated in his interview that he did not notice any ignitable liquids but that he had a mask on and that he noticed that a motorcycle was leaned up against a wall in the basement but that he "really wouldn't be able to tell [where the fire started] other than what they said about the bike"[9] and that "he did not know if that'd [sic] be hot enough to ignite it but it could." (Southern Statement at p. 8).  Southern did not notice any gasoline containers in the basement.  (*Id.*).  He also had no indication that anyone had started the fire.  (*Id.* at p. 10).  He further noted that the defendant appeared to be upset at the time of the event.  (*Id.*).

Volunteer fireman James Larry Wade also was interviewed and stated that he saw no evidence of arson although he stayed at the truck manning the pumper and never entered the house.  (Wade Statement at p. 5).  He did walk over to the garage at one point and could see that the stairs leading from the basement to the first floor "was heavy burnt." (*Id.* at p. 6).  Like

---

[8]The affidavits of the volunteer firemen are located with the defendant's sur-reply at document 27.

[9]The information was that it had been ridden by the defendant's son just before they left the house.  (*Id.* at p. 9).

Southern, Wade did not notice any gasoline containers in the basement.  (*Id*.).

Finally, Oneonta fireman Joel Higgins was also interviewed.  He stated that he, too, did not conduct any kind of investigation to determine where and how the fire started.  (Higgins Statement at p. 10).  However, he did not smell any accelerants while he was in the house after the fire.  (*Id*. at p. 6).  He also stated that he could not tell where the fire started, but "it looked like more of it was burnt in the living room and kitchen area."  (*Id*. at p. 10).

## DISCUSSION

### Motion for Summary Judgment

#### Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Celotex,* 477 U.S. at

322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met her burden, Rule 56(e)

"requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  The nonmoving party

need not present evidence in a form necessary for admission at trial; however, the movant may

not merely rest on the pleadings.  (*Id.*).

   After a motion has been responded to, the court must grant summary judgment if there is

no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are

irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at

249.

### Analysis

   In Alabama there are two theories under which an insurance company may be liable for

bad faith failure to pay claims.  The typical or "normal" bad faith claim occurs where the insurer

fails to pay in the absence of a legitimate reason for failing to do so.  To establish a "normal" bad

faith claim, the insured must show: "(1) a breach of the insurance contract; (2) an intentional

refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason

for that refusal; and (4) the insurer's actual knowledge of the absence of any legitimate or

arguable reason."  *Mutual Service Casualty Ins. Co. v. Henderson*, 368 F.3d 1309, 1314 (11th Cir.

2004) (citing *Employees' Benefit Assoc. v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998).  The

8

insured must first be able to show that he is entitled to a directed verdict on the breach of contract claim before he or she can recover under this theory. *Grissett*, 732 So. 2d at 976. Accordingly, the court's first task in analyzing a "normal" bad faith claim is to determine whether a "'legally sufficient evidentiary basis' [exists] for a reasonable jury to find for [the insured] on the breach of contract claim. ALA. R. CIV. P. 50(a); *see also Dutton*, 419 So. 2d at 1362 ("Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the ['normal' bad faith] claim must fail and should not be submitted to the jury.")." *Henderson*, 368 F.3d at 1314.

The second type of bad faith failure to pay claim is the "abnormal" bad faith claim.[10] "'In order to recover under such a theory, the insured must show (1) that the insurer failed to properly investigate the claim or subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim.'" *Henderson*, 368 F.3d at 1315 (quoting *Simmons v. Congress Life Ins. Co.*, 791 So. 2d 371, 379 (Ala. 2000)). "Practically, . . . in order to prove a bad-faith-failure-to-investigate claim, the insured must prove that a proper investigation would have revealed that the insured's loss was covered under the terms of the contract." *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 318 (Ala. 1999). Failure to properly investigate a claim amounts to an "intentional[] or reckless[] fail[ure] to conduct an adequate investigation of the facts and submit those facts to a thorough review." *Id.* An "arguable reason," which is sufficient to overcome a "normal" bad faith claim, is not sufficient to overcome an "abnormal"

---

[10]This claim is also referred to as the "unusual" or "extraordinary" claim. *See Nobles v. Rural Community Ins. Services*, 303 F. Supp. 2d 1292, 1305 (M.D. Ala. 2004).

bad faith claim.  Instead, to avoid "abnormal" bad faith liability, the insurer must "marshal all of the pertinent facts with regard to its insured's claim" before denying coverage.  *Henderson*, 368 F.3d at 315 (citing *Nat'l Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 130 (Ala. 2002)).  However, in resolving this motion, it is necessary to recognize that "'[b]ad faith. . . is not simply bad judgment or negligence.  It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.'"  *Singleton v. State Farm Fire Casualty Company*, ___So. 2d___, 2005 WL 3007974, *2 (Ala. 2005) (citing *Slade*, 747 So. 2d at 303-04).

In his counterclaim, Bates asserts that Owners "wrongfully and intentionally failed and refused to investigate the basis of [his] claim for insurance proceeds," which is an "abnormal" bad faith claim.[11]  (Counterclaim at ¶ 7).  Therefore, the court must look to whether Owners' refusal to pay the claim stems from its reckless failure to investigate or review the claim.  As basis for his claim, Bates asserts as follows:

> . . . .  The Owners employees were too busy to investigate the claim, [sic] themselves.  The Home Office conducted no investigation of its own.  The independent adjuster failed to perform any substantive investigation and, instead, had "a correspondence with Community Bank," simply visited the scene, made an estimate of the damage, and researched property records.  (Citation omitted).  Robert Young failed to interview any of the firemen who had extinguished the fire. . . .

> Moreover, Owners has failed to subject the results of its investigation to a cognitive evaluation and review.  Rather, it has ignored facts within its possession, abandoning its duty to make a claim decision.  For example, Owners had within its possession the Straight Mountain Fire Report indicating that there was no incendiary device such as gasoline that started this fire.  Owners ignored

---

[11]In its motion for summary judgment, Owners asserts that it cannot be liable for bad faith because it had, at least, an arguable reason for refusing to pay the Bates' claim.  (Owner's Memorandum at pp. 2-10).  However, the court agrees with the Bates that Alabama law is clear that an arguable reason is not sufficient to defeat an "abnormal" bad faith liability claim.  *See Henderson*, 368 F.3d at 315 (citing *Slade*, 747 So. 2d at 315-16).

this evidence even when its corporate representative testified that this fact would
be "compelling."  (Citation omitted).[12]

> In sum, because Owners failed to investigate the claim in the first instance
> and compounded this problem by failing to perform a cognitive evaluation and
> review, Bates' claim for bad faith should survive summary judgment.  Owners
> argues only that it had an arguable reason for filing this declaratory judgment
> action.

(Consolidated Objection at pp. 13-14).[13]  While the court agrees with Bates that an arguable

reason for not paying the claim is not sufficient to defeat his claim, the court finds the cases

offered by Bates in support of the contention that Owners failed to investigate the claim to be

distinguishable from the instant case.

> In *Slade*, the Supreme Court of Alabama noted that:

> To this date, the abnormal cases have been limited to those instances in which the
> plaintiff produced substantial evidence showing that the insurer (1) intentionally
> or recklessly failed to investigate the plaintiff's claim; (2) intentionally or
> recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation
> or review; (3) created its own debatable reason for denying the plaintiff's claim;
> or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the
> plaintiff's claim.

747 So. 2d at 307.  Although the insurer in *Slade* conducted an investigation of the

damage done to the Slade's property, the Slades were able to produce the following evidence that

---

[12]Jason Baswell, the volunteer fireman that filled out the Fire Report explained, regarding the notation on the report
that no human factors contributed to the ignition, that:

> A:  . . . [W]hen we fill this report out, we usually have to put none or check one of the other boxes
> that they have, those boxes did not apply to him, like I said one's asleep, one's possibly impaired by alcohol,
> that usually the human factors is somebody is in the house when the fire starts, so that would not apply to
> him that's why you can't put does not apply, you have to put none.
> Q:  When checking none does that mean that the owner, or human had nothing to do with the
> igniting of this fire?
> A:  No, that's not what it says.
> Q:  Did you see any evidence that . . . a human had anything to do with starting this fire?
> A:  Like I said from my training, I did not see anything that seemed out of place.

(Baswell Statement at pp. 9-10).

[13]The "Consolidated Objection" is located at document 24.

11

the investigation was not done properly:

> The Slades produced evidence indicating that State Farm *never*, in the course of its investigation, sent to their home someone who was qualified to conduct a lightning investigation.  The Slades presented evidence indicating that State Farm never interviewed any of the witnesses present on the day lightning struck their retaining wall.  The Slades presented expert testimony indicating that these omissions amounted to an improper investigation, on the basis that an investigation of a claim such as the Slades made required the use of a lightning expert.  The Slades also presented evidence indicating that State Farm did not investigate lightning as a cause.  The Slades produced evidence indicating that State Farm told its engineer, Buck Durham, to investigate a "possible soil problem" and that it did not tell Durham about the lightning strike.  This evidence conflicted with State Farm's "Good Faith Claims Handling" video, which was admitted into evidence and which contained a statement that State Farm's claims-handling policy was to attempt to find coverage.

> This evidence, the Slades say, shows that State Farm never investigated the possibility that lightning directly struck their dwelling, a fact, which if proven, would negate the application of the earth movement exclusion. . . .

> Furthermore, State Farm's argument on this point, i.e., that it cannot be held liable because it believes it properly investigated noncovered events and found evidence that noncovered events caused the Slades' loss, is unacceptable.  An insurance company's duty to investigate does not extend only to those events that are not covered.  As this court stated in *Lavoie*, supra, 505 So. 2d at 1052-53, an insurance company has a "responsibility to marshal all . . . facts" necessary to make a determination as to coverage "before its refusal to pay."  (Emphasis in original).  This duty must include a duty to investigate a covered event that an insured claims has caused his loss.

*Slade*, 747 So. 2d at 315-16.  Furthermore, the Slades produced evidence (in the form of expert testimony and investigative reports) that the damage to their house was done by a covered event.  *Id*. at 307-08.  The Slades were not only able to show that State Farm failed to properly investigate their claim, but they also produced evidence that the damage was a result of lightning, which, if true, would have required State Farm to cover their claim.  Even in light of that evidence, State Farm neglected to include as part of its investigation even the possibility that

lightning caused the damage.  Instead, it chose to only focus on whether soil erosion could have been the cause, which would have resulted in exclusion of the claim.

Likewise, in *Henderson,* the court found a question of fact existed as to whether the insurance company's investigation was deficient because the adjuster did not bother to determine a correct date for when the plaintiffs' damage occurred when two different dates were presented in two different complaints.  In so deciding, the court noted that:

> . . . . [The insurance agent] did not call Mr. Henderson to ask him when the events alleged in the amended complaint occurred.  He did not call the clerk of court to inquire when the amended complaint was filed.  He did nothing but rely upon the date on the original complaint.  Such an investigation is hardly one in which he fulfilled his duty to "marshall all of the pertinent facts with regard to [the] insured's claim" before denying coverage.  *Sockwell*, 829 So. 2d at 130. While [the agent] may not have intended to injure Mr. Henderson with this deficient investigation, he arguably investigated in a reckless manner by failing to adequately investigate the facts and submit those facts to a thorough review.  *See Blackburn*, 667 So. 2d at 668.

*Henderson*, 368 F.3d at 1317.

In the instant case, the defendant/counter-plaintiff has offered no evidence, other than the recently prepared affidavits of a neighbor who initially discovered the fire and the firemen who were on the scene, which adequately disputes Owner's findings for purposes of summary judgment.  However, based upon the limitations of and qualifications in those statements, they are insufficient to support a bad faith claim as a matter of law.  By way of example, the affidavit of Q.J. Arnold, a neighbor and the first person to respond at the house, stated that (1) he saw only one fire and it was in the basement near the motorcycle, (2) he did not see a fire upstairs, and (3) he believes that he could have extinguished the fire if he had found a garden hose.  (Arnold Aff. at ¶¶ 4-5).  He also stated that he had not been contacted by anyone from Owners.  (*Id*. at ¶

6). Arnold's observations, while certainly relevant, do not possess the requisite force and effect to challenge the undisputed evidence that the fire was incendiary. Unlike the situation in *Slade*, his visual observations were not presented to Owners in 2003, particularly when Young was making his examination and conducting his investigation. There is no evidence before the court suggesting that Owners ignored or disregarded this information at the relevant time.

The affidavits of the responding firemen, while relevant to the contract claim, are also insufficient to overcome the motion for summary judgment. Like the affidavit of Arnold, these affidavits were not prepared until after this litigation was initiated. Additionally, unlike *Slade*, there is no evidence that this information was presented to Young or anyone else associated with Owners during the investigatory stage as far as this court can discern. Thus, there is no evidence that they ignored the possibility that the fire was covered. Still further, the value and import of these statements is limited on the bad faith claim because of the qualifiers associated with the statements. For instance, (1) Baswell stated that the firemen receive "minimal training" regarding the investigation of the causes and origin of fires, but are focused on the "extinguishment of the fire" (Baswell Statement at p. 2), (2) Wade never entered the house, (3) Southern could not tell if the motorcycle, which was leaned against the wall, was hot enough to ignite a fire, and (4) Baswell stated he "really didn't look that close" while inside (Baswell Statement at p. 6).[14]

---

[14]The court also notes that Young did not ignore the possibility that the motorcycle was the origin of the fire. He stated in his report that

. . . . [t]he motor[cycle] was a manual start which did not have a source of electrical service when [the] engine was not operating. The way the motor burned indicated it was damaged as fire spread from [the] stairs . . . .

(Young Report at p. 3).

In contrast to the foregoing, the evidence shows that Owners sent Young, a certified fire investigator, to the scene to investigate the cause and origin of the fire.  There is no evidence that Owners sent Young with a preconceived notion that the fire was caused by arson.  To the contrary, from what appears in the record, Owners simply used him because of the pressing work load on its staff and his assignment was to determine the cause and origin of the fire.  In contrast to the Slades, who hired their own investigator to determine the cause of the damage, counter-plaintiff Bates and his wife failed to respond promptly to Owners' inquiries as required by their policy and appeared to delay the investigative process.  The court finds the facts of the instant case readily distinguishable from those in *Slade* and *Henderson*.  It further finds that the counter-plaintiff has failed to call into question the propriety of Owners' investigation to sufficiently establish a claim for bad faith.[15]

Young's report conclusively states that the fire was a result of an incendiary device.  Had Bates offered the report of a fire investigator that disputed that, Owners may have had a duty to do more than it did.  However, Owners filed a complaint for declaratory judgment which will allow a court of law to determine whether the claim is due to be paid.  The court therefore finds that the circumstances do not support a claim for bad faith.

## CONCLUSION

Based upon the foregoing, the court finds that the plaintiff's motion for partial summary judgment is due to be granted.  The claim and evidence does not set forth facts which could

---

[15]To the extent the counter-plaintiff places much weight on the fact that Owners hired an independent expert to service the claim, the Bates have offered nothing to show that such an act is an unacceptable practice in the insurance industry or that it amounts to a failure to investigate.

establish a claim for bad faith.[16]  An appropriate order will be entered contemporaneously herewith.

        **DONE**, this the 8th day of February, 2006.

                                      *John E. Ott*
                                  JOHN E. OTT
                              United States Magistrate Judge

---

[16]To the extent that the counter-plaintiff asserts that the affidavit of Young should be struck (Consolidated Objection at p. 7, n. 1), this was the subject of a separate motion to strike, or, in the alternative, to allow the counter-plaintiff to file responsive affidavits (doc. 26), which was granted in part and denied in part (Order dated September 27, 2005).